# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**UNITED STATES OF AMERICA**
          **Plaintiff,**

**v.**                                                    **Case No. 05-CR-325**

**MARIA FREGOSO-BONILLA and**
**HERMALINDA VALLE-FREOGOSO**
          **Defendants.**

---

## DECISION AND ORDER

Defendants Maria Fregoso-Bonilla and Hermalinda Valle-Fregoso are charged with conducting an unlicensed money transmitting business (count one), contrary to 18 U.S.C. § 1980(a), (b)(1)(A) & (b)(1)(B). Valle-Fregoso is also charged with use of a false social security number (count two), contrary to 42 U.S.C. § 408(a)(7)(B). Defendants filed motions to suppress statements they made to an Immigration and Customs Enforcement ("ICE") agent on December 6, 2005, as well as physical evidence seized from their home on that date. They also moved to dismiss count one of the indictment on the grounds of vagueness, and Fregoso-Bonilla separately argued that the indictment was insufficient on this count as to her. Finally, Valle-Fregoso filed a motion to disclose the identity of the confidential informant relied upon by the government, and Fregoso-Bonilla filed a motion for discovery.

The motions were referred to a magistrate judge, who held a hearing then recommended that the motions to suppress statements and physical evidence be granted. Specifically, the magistrate judge found that ICE agents entered defendants' home without

consent from one apparently authorized to admit them, and that the agents violated defendants' rights under Miranda v. Arizona, 384 U.S. 436 (1966), by interrogating them without first reading them their rights. The magistrate judge recommended that the motions to dismiss be denied. Specifically, he found that § 1960 was not vague and that count one contained sufficient allegations as to Fregoso-Bonilla. Finally, the magistrate judge denied the motions for discovery and disclosure.

Fregoso-Bonilla objected to the recommended denial of her motions to dismiss, and the government objected to the recommended grant of the motion to suppress physical evidence.[1] The government also requested a de novo evidentiary hearing on that issue, which request I granted.[2] My review of the recommendations on the objected-to issues is

---

[1] The government did not object to the recommendation that the motions to suppress statements be granted. Thus, my review is for clear error only. See Johnson v. Zema Sys. Corp., 170 F.3d 734, 739 (7th Cir. 1999). Finding no such error, I will grant the motions. Neither side has sought my review of the magistrate judge's rulings on the non-dispositive motions. Thus, those orders stand. In her objections, Fregoso-Bonilla raised an issue with her access to voluminous discovery apparently generated in a related case in Utah. However, she did not ask that I take any action at this time. I have discussed this issue with counsel at previous hearings and asked the government to facilitate defendants' review of the relevant, discoverable material.

[2] The magistrate judge recommended that the motion to suppress evidence be granted based on an invalid entry into defendants' home. The government objected and asked for a de novo hearing due to the fact that the magistrate judge and the parties focused on the validity of defendant Fregoso-Bonilla's consent to search the home, not on the consent to enter received from a third party, Jose Pilar-Fregoso. The government argued that because the focus of the proceedings was the consent to search, not to enter, it should be permitted to flesh out the record on the latter issue. Defendants opposed the request, but I concluded that a de novo hearing on the issue of the agents' entry was appropriate. At the previous hearing, both the magistrate judge and the lawyers agreed that the issues were consent to search and whether defendants were in custody for purposes of Miranda. (5/9/06 Tr. at 115, 121; see also 5/25/06 Tr. at 77-78.) The parties addressed those issues, not the entry, in their post-hearing briefs. Thus, I concluded that a supplemental hearing on the entry issue would be helpful. Defendant Valle-Fregoso also argued that the government's objections were untimely, but, excluding the intervening

de novo.  Fed. R. Crim. P. 59(b).  I now issue the following order denying defendants'
motions.

## I. MOTIONS TO SUPPRESS

### A.    Facts and Background[3]

ICE Special Agent Shaun Gibson testified that on December 6, 2005, he was
investigating an illegal money transmitting business located at 1137 S. 18th Street in
Milwaukee.  He stated that he and about seven other ICE agents went to that address in
order to conduct a knock and talk investigation and attempt to gain consent to search.  The
agents all wore attire identifying themselves as law enforcement.  Gibson testified that
about five minutes before the agents proceeded with the knock and talk, a car containing
two men arrived,[4] and the men entered the house without knocking or using a key.

Gibson, accompanied by two other agents,[5] knocked on the front door, and one of
the persons who had just entered the house, a Hispanic male, answered the door.  Gibson
initially spoke in English, but switched to Spanish when the man indicated he spoke only

_____

weekends, holiday and court closure, the objections were filed within the ten days allotted.

[3]Because defendants do not contest the magistrate judge's finding that Fregoso-
Bonilla validly consented to the search, and the government does not contest his finding
that defendants' statements were taken in violation of Miranda, I will not include a complete
recitation of all factual details pertinent to those issues.  Instead, I focus on the entry.

[4]Gibson testified that about thirty minutes before he proceeded with the knock and
talk another car arrived containing several women and men, and that they entered the
house.  Based on later testimony from Maria Del Carmen Fregoso, it appears that this car
contained defendant Fregoso-Bonilla and several of her relatives, who had all gone to the
DMV earlier that morning.

[5]The remaining agents stationed outside the other exits to make sure no one ran
away.

a little English. Gibson testified that he took two years of Spanish in high school and had some experience speaking Spanish on the job. He described his grasp of the language as basic, and stated that he was comfortable with certain phrases often used in the line of duty.

Gibson explained who the agents were and asked for the man's name, and the man responded Jose Pilar-Fregoso. Based on his previous investigation, Gibson believed that a possible owner of the house was Maria Fregoso, and he concluded that the man who answered the door was likely a relative of her's.[6] Gibson asked permission to enter, and Pilar-Fregoso stepped back and allowed them in without calling to anyone in the house. The agents followed Pilar-Fregoso about seven to ten feet inside the house into the living room, and Gibson asked Pilar-Fregoso if he lived there. Pilar-Fregoso said he did not. Gibson asked who did, and Pilar-Fregoso pointed to the kitchen, where Gibson saw about eight individuals eating at the table. Gibson proceeded to the kitchen, identified himself and asked each person for his or her name and if he or she lived there. Some said they lived there, others said they did not. Gibson identified defendant Fregoso-Bonilla as one of the individuals in the kitchen and confirmed that she was the owner of the home.

Gibson asked Fregoso-Bonilla to come back with him into the living room, and she followed. Gibson asked her if she understood English, and she responded in Spanish. Gibson continued the conversation in Spanish, asking her if there were any drugs, guns or money in the house. Fregoso-Bonilla chuckled. Gibson then asked for permission to search the residence for drugs, papers, money and guns, and Fregoso-Bonilla said "yes"

---

[6]Gibson also had information that others with the name Fregoso, including possibly defendant Valle-Fregoso, lived there as well.

4

in Spanish and gestured with her arm to go ahead. At that point, Gibson pulled out an ICE consent to search form, which was printed in English and which Gibson explained to Fregoso-Bonilla in Spanish. He stated that he explained the form in general terms, not word for word. Fregoso-Bonilla asked why her home was being searched, and Gibson found it hard to explain to her in Spanish, so he located a bilingual person, Maria Del Carmen Fregoso, in the kitchen, who interpreted for him, explaining that the agents were concerned about the large amount of traffic in and out of the house, which they believed was indicative of drug dealing. Fregoso-Bonilla signed the consent form, and the other agents searched the residence.

While the search was ongoing, Gibson interviewed Fregoso-Bonilla, with Del Carmen Fregoso interpreting. Gibson testified that he did not provide Fregoso-Bonilla with Miranda warnings because he did not consider her to be in custody. Gibson also interviewed defendant Valle-Fregoso, again through Del Carmen Fregoso. He also did not read Valle-Fregoso her rights, again because he did not consider her to be in custody. After the interviews, both defendants were arrested and taken into custody. No one else inside the residence was arrested. Gibson testified that the entire encounter lasted about three and one-half hours.

Del Carmen Fregoso testified that Fregoso-Bonilla is her aunt and Valle-Fregoso her cousin.[7] She stated that on December 6, 2005, she was at defendants' house for breakfast, having previously gone with her aunt and uncle to the DMV in order to translate for her uncle when he applied for a driver's license. Del Carmen Fregoso testified that she

_____

[7]Pilar-Fregoso (the man who answered the door) is her father.

5

and her father, Pilar-Fregoso, used to live with her aunt and cousin at 1137 S. 18th Street, but they moved out about two months before the search.

Del Carmen Fregoso testified that shortly after they arrived back at her aunt's home the agents appeared. She stated that she was asked by Agent Gibson to interpret between him and Fregoso-Bonilla. Del Carmen Fregoso testified in court in English, but stated that Spanish was her primary language and that she did not know "a lot" of English. Del Carmen Fregoso stated that Gibson told her to advise her aunt that the agents were there because they were looking for money, drugs and guns, which she did. Del Carmen Fregoso testified that her aunt told her to tell the agents, yes, they could search the house. She stated that the agents did not begin searching until her aunt said it was okay.

Del Carmen Fregoso testified that during defendants' interviews and the search the agents would not let anyone move about. She stated that she did not feel free to leave, and that her father had to ask permission to leave, which request was granted. Her uncle was also allowed to leave at the same time. Del Carmen Fregoso stated that Fregoso-Bonilla never got upset and never told the agents to leave.

## B.    Legal Standards

Warrantless entries and searches of the home are presumptively unreasonable, subject to a few narrow exceptions. E.g., Payton v. New York, 445 U.S. 573, 586 (1980). One such exception is a search conducted pursuant to consent. United States v. Dorsey, 27 F.3d 285, 290 (7th Cir. 1994). A voluntary consent "lifts" the warrant requirement. United States v. Stribling, 94 F.3d 321, 324 (7th Cir. 1996). "The government bears the burden of proving by a preponderance of the evidence that consent was freely and voluntarily given." United States v. Grap, 403 F.3d 439,

6

443 (7th Cir. 2005) (citing <u>United States v. Basinski</u>, 226 F.3d 829, 833 (7th Cir. 2000)). The determination of whether consent was voluntary is based on the totality of the circumstances. <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 227 (1973). Relevant factors include (1) the person's age, intelligence, and education; (2) whether she was advised of her constitutional rights; (3) how long she was detained before giving consent; (4) whether her consent was immediate, or was prompted by repeated requests by the authorities; (5) whether any physical coercion was used; and (6) whether the individual was in police custody when she gave consent. <u>United States v. Raibley</u>, 243 F.3d 1069, 1075-76 (7th Cir. 2001) (citing <u>United States v. Strache</u>, 202 F.3d 980, 985 (7th Cir. 2000); <u>Valance v. Wisel</u>, 110 F.3d 1269, 1278 (7th Cir. 1997)).

A person with common authority over the premises to be searched may provide consent. <u>Foreman v. Richmond Police Dep't.</u>, 104 F.3d 950, 958 (7th Cir. 1997). The government must demonstrate by a preponderance of the evidence that permission to enter or search was obtained from a third party who possessed common authority over, or other sufficient relationship to, the premises sought to be inspected. <u>United States v. Brown</u>, 328 F.3d 352, 356 (7th Cir. 2003). The ultimate question for the court is not whether the third party had the <u>actual</u> authority to consent, but whether it was reasonable for the police to believe he did. <u>Foreman</u>, 104 F.3d at 958. Actual or apparent authority will suffice. <u>United States v. Klotz</u>, 943 F.2d 707, 709 (7th Cir. 1991). Thus, consent given by one with apparent authority, even if it turns out he did not have actual authority, is valid; this so because Fourth Amendment issues are viewed objectively, based on the knowledge

7

known to the officers at the time they act.  See United States v. Chaidez, 919 F.2d 1193, 1201 (7th Cir. 1990).

To assess whether apparent authority exists, the court must look for indicia of actual authority.  United States v. Rosario, 962 F.2d 733, 737 (7th Cir. 1992).  The mere presence of the third party does not necessarily justify a reasonable belief that he has the authority to consent.  Rather, apparent authority turns on law enforcement's knowledge about the third party.  Basinski, 226 F.3d at 834; see also Rosario, 962 F.2d at 738 ("The question is not who comes to the door so much as it is whether whoever appears there projects an aura of authority upon which one can reasonably rely.").  The clearer the relationship between the third party and the defendant, the easier it is for the government to sustain its burden of demonstrating authority.  United States v. Ladell, 127 F.3d 622, 624 (7th Cir. 1997).  However, the police have a duty to inquire further if the surrounding circumstances make the authority seem questionable.  Montville v. Lewis, 87 F.3d 900, 903 (7th Cir. 1996) (citing Illinois v. Rodriguez, 497 U.S. 177, 188-89 (1990)).  The court considers the totality of the circumstances on the issue of apparent authority.  See Ladell, 127 F.3d at 624.

C.    Discussion

In the present case, I find that Pilar-Fregoso had the apparent authority to admit the agents.  Gibson knocked on the door to defendants' home, and Pilar-Fregoso answered.  The agents identified themselves and asked Pilar-Fregoso for his name. Gibson testified, based on information he had from City records and an informant that Maria Fregoso-Bonilla likely owned the home, that he believed Pilar-Fregoso was a

8

relative of her's.[8]  Further, just a few minutes before he approached the home, Gibson saw Pilar-Fregoso enter without knocking.   This manner of entry supported the reasonableness of Gibson's belief that Pilar-Fregoso possessed the authority to let him in.   Pilar-Fregoso readily admitted the agents, without calling to anyone in the house for permission or even looking back into the house.  There is no evidence (and defendants do not argue) that Pilar-Fregoso's consent to the entry was other than voluntary.  Based on these circumstances, I find that it was reasonable for Gibson to believe Pilar-Fregoso possessed authority to consent to the entry.[9]

Once inside, the agents asked Pilar-Fregoso if he lived at the house, and he said he did not.  It would have been better if Gibson had asked this question at the door, before he entered; however, his failure to do so was not unreasonable.  The

---

[8]Gibson also had information that others with the name Fregoso lived at the house, too.

[9]Defendants attack Gibson's credibility, arguing that Gibson did not mention obtaining Pilar-Fregoso's name at the door during the first hearing.  However, based on my observation of his demeanor at the supplemental hearing, I found Gibson highly credible.  Further, the first hearing before the magistrate was, as stated above, focused on the consent to search, not the entry.  I found the supplemental hearing helpful in deciding the latter issue.  Finally, Gibson noted that he mentioned obtaining Pilar-Fregoso's name at the door in an earlier report, which supports his testimony that he was not making this up to bolster an objection to the magistrate judge's recommendation.  Defendants also attack Gibson's testimony as to his knowledge of the identity of the owner of the home prior to the knock and talk.  Again, I found Gibson's testimony as to the sources of his knowledge straight-forward and credible.  The fact that certain documents pertinent to that issue which he reviewed prior to the knock and talk were not provided to the government or the defense prior to the initial hearing does not undermine his credibility.  Defendants also fault the government for not calling Pilar-Fregoso, but I do not see how that undermines the government's position.  Gibson's testimony on the entry issue was sufficient.  Further, defendants were, of course, free to call Pilar-Fregoso if he would have contradicted Gibson's testimony as to the circumstances of the entry.

9

Fourth Amendment does not demand the best police practices.[10]  <u>See</u> <u>Dickerson v.</u>
<u>McClellan</u>, 101 F.3d 1151, 1160 (6th Cir. 1996) ("The Fourth Amendment does not
require officers to use the best technique available as long as their method is
reasonable under the circumstances."); <u>Sheik-Abdi v. McClellan</u>, 37 F.3d 1240, 1247
n.5 (7th Cir. 1994) (noting that the Constitution does not require police to follow the
best recommended practices).  Gibson acted reasonably upon learning that Pilar-
Fregoso did not live at the residence.  He asked who did live there and was directed
to the kitchen.  In the kitchen, he promptly located Fregoso-Bonilla and confirmed that
she was the owner.[11] He then asked her for consent to search, which she promptly
granted.  No search was conducted and no evidence recovered from the house prior
to Fregoso-Bonilla's consent.

It is true, as the magistrate judge noted, that Gibson did not ask Fregoso-
Bonilla for permission to remain in the house.  However, under the circumstances,
given Fregoso-Bonilla's cooperativeness and immediate consent to search, it was
reasonable for Gibson to believe that she was also consenting to the agents

---

[10]Similarly, it was, at least in hindsight, unwise for the agents to conduct a knock and
talk at the home of Hispanic individuals without a fluent Spanish speaker with them.
Gibson was, as a result, required to rely on the relative of one of the suspects to interpret.
As the magistrate judge aptly stated, the agents were prepared for the knocking but not the
talking.

[11]Defendants argue that based on information he had that Fregoso-Bonilla was the
owner of the home, Gibson was required to ask for her at the door.  However, the Fourth
Amendment allows consent to be obtained from anyone with apparent authority.  It does
not require law enforcement to seek out the owner.  <u>See</u> <u>United States v. Alcantar</u>, 271
F.3d 731, 737 n.7 (8th Cir. 2001) ("It is well settled that consent to a search may be given
not only by the owner of the property to be searched but also by a third party who
possesses common authority over or other sufficient relationship to the premises . . .
sought to be inspected.") (internal quote marks omitted).

Case 2:05-cr-00325-LA   Filed 09/07/06   Page 10 of 25   Document 78

presence. The Constitution did not require the agents to go back outside, summon Fregoso-Bonilla to the door, and ask to be let in again. Fregoso-Bonilla at no point during the entire encounter told the agents to leave.

This case is much like <u>United States v. Rosario</u>, 962 F.2d 733, in which the court found apparent authority to consent to an entry. In that case, officers responded to a motel room from which the odor of marijuana was emanating. Prior to knocking on the door, the officers learned that the room was registered to Augusto Estrada, a forty-six-year old man. Officer Herlache knocked on the door, which was answered by a Hispanic male in his mid-twenties. The officers explained why they were there and asked for permission to enter, and the man gestured for them to come in. Once inside the room, the officers observed contraband and arrested the two other men inside, Estrada and Rosario. <u>Id.</u> at 734-35. The defendants argued that the man who answered the door (later identified as Rubin Vilaro) lacked apparent authority to admit the officers, but the court disagreed. Because the defendants' arguments in <u>Rosario</u> closely resemble those made in the present case, I quote from the court's opinion at length:

> Rosario and Estrada contend that . . . the officers in the instant case had no information regarding Vilaro's authority to consent to the search of Defendant Estrada's room. To the contrary, the police officers outside Room 315 obtained enough information during their brief encounter with Vilaro to make a reasoned judgment about his authority to admit them into the room.

> Seconds after Herlache knocked on the door to Room 315, which the officers knew to be registered to a 46 year-old man named Estrada, the door opened and Vilaro appeared in the threshold. At this point, the officers had no reason to suspect that the room was occupied by more than one person, never before having encountered Vilaro, Estrada, or Rosario. When the police identified themselves, explained why they

11

were there, and then asked if they could come into the room, Vilaro--without hesitation--gestured for the officers to enter. He may even have voiced his acquiescence before opening the door wider.

The record, in any event, reveals that Vilaro did not communicate with anyone else inside the room to ask whether he could invite the officers inside. Nothing about Vilaro's speech or mannerism suggested that he needed to obtain someone else's approval to permit the entrance of the officers. Nor did Rosario or Estrada approach the doorway, voice their objections to the proposed entry, or otherwise attempt to intercede in the exchange between Vilaro and the police. Their presence in Room 315, in fact, did not become apparent until the officers set foot into the room and discovered them seated at the table. By allowing Vilaro unfettered access to the door, the appellants also gave him discretion to decide whom to admit, thereby sacrificing some degree of their privacy. Since the underpinning of third-party consent is assumption of risk, one's expectation of privacy in such a situation is not absolute, but contingent in large measure on the decisions of another. In short, nothing about the interaction between Vilaro and the officers at the door conceivably could have undermined a reasonable person's impression that Vilaro was vested with the power to allow whomever he pleased into Room 315.

As if a person's age were as obvious as the color of one's hair, the appellants make much of the fact that a man appearing to be in his twenties or thirties opened the door to Room 315 instead of a 46 year-old--much ado about nothing. This discrepancy, they claim, should have alerted the officers that the man who greeted them could not possibly have been Estrada, in whose name the room was registered. Since it was readily apparent to the police that Vilaro failed to match the description of Estrada, the argument proceeds, the officers could not reasonably have believed that the man in the doorway could give them license to  enter the room. The record does not even conclusively demonstrate that the officers in fact realized that the man who answered the door was not Estrada. Still, the argument is not persuasive.

While the police made no effort to determine the identity of the man in the doorway, their alleged realization that Estrada was not at the door is not dispositive on the issue of apparent authority. The question is not who comes to the door so much as it is whether whoever appears there projects an aura of authority upon which one can reasonably rely. Moreover, the Fourth Amendment makes no insistence that the decisions of government agents always be correct. Police officers would be held to an impossibly high standard if expected to carry out their duties infallibly, and the courts have long recognized that mistakes will occur. But the mistakes must be those of reasonable men, acting on

12

facts leading sensibly to their conclusions of probability. As the Court put it in Hill v. California, sufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment.

That is not to say, of course, that it would be reasonable for law enforcement agents to believe in every instance that someone who invites them into a home or a room is authorized to do so. This circuit never has maintained that proposition. As the Court stated in Rodriguez: "Even when the invitation is accompanied by an explicit assertion that the person lives there, the surrounding circumstances could conceivably be such that a reasonable person would doubt its truth and not act upon it without further inquiry." This language suggests that in the absence of sufficient facts, officers have a duty to seek further information in order to determine whether they may reasonably infer that the inviter has the necessary authority to consent to an entry or search of the premises.

Despite the appellants' arguments to the contrary, the record indicates that the officers actually received ample information to conclude with reason that Vilaro possessed the authority to allow them into the room. No further inquiry was required of them because Vilaro acted at all times as though he were the keeper of the door to Room 315. Neither of the defendants endeavored to challenge such appearances. Since the police gained entry to the room at the sufferance of someone entitled to admit them, the evidence they obtained is admissible against everyone.

Id. at 737-38 (internal citations and quote marks omitted).

In the present case, like Rosario, the door to the home was answered by someone Gibson knew was likely not the listed owner. However, like Rosario, the man who answered admitted the agents without hesitation and without asking anyone else inside. Nothing about Pilar-Fregoso's manner suggested that he needed someone's permission to consent. Nor did anyone else inside, including defendants, approach the door to voice an objection, or object to the agents' presence once inside. Finally, the government's position in the present case is even stronger than in Rosario, given Gibson's belief that Pilar-Fregoso was related to the owner of the home and his observation that Pilar-Fregoso entered without knocking. Coupled with

13

the aura of authority Pilar-Fregoso projected when he answered the door, this knowledge made Gibson's belief that Pilar-Fregoso had authority all the more reasonable.

Therefore, for all of these reasons, I find that the agents obtained voluntary consent to enter from one with apparent authority. I further find that the agents reasonably investigated Pilar-Fregoso's authority upon entering, and reasonably sought permission to search from the owner of the home once it became apparent that Pilar-Fregoso did not live there.[12]

Defendants do not contest the magistrate judge's finding that Fregoso-Bonilla's verbal consent to search the home was valid, and such finding is not clearly erroneous. See Johnson v. Zema Sys. Corp., 170 F.3d 734, 739 (7th Cir. 1999) ("If no objection or only partial objection is made, the district court judge reviews those unobjected portions for clear error."). Both Gibson and Del Carmen Fregoso testified that Fregoso-Bonilla promptly and freely provided verbal consent for the agents to search for drugs, documents, money and guns. Gibson did not threaten or physically coerce Fregoso-Bonilla, nor did he ask for consent repeatedly or in a hostile tone. Further, Fregoso-Bonilla did not appear to be overwhelmed or upset at the time; in fact, she chuckled when Gibson mentioned drugs and guns. Finally, the evidence

---

[12]At the hearing before the magistrate and in her motion, Fregoso-Bonilla argued that the agents needed some form of probable cause or reasonable suspicion in order to conduct the knock and talk. (5/9/06 Tr. at 53.) There are three types of police-citizen encounters: arrests, which require probable cause; Terry stops, which require reasonable suspicion; and requests for voluntary cooperation, which require no suspicion at all. See United States v. Odum, 72 F.3d 1279, 1283-84 (7th Cir. 1995). The police generally may approach a suspect and request consent to search without probable cause or reasonable suspicion. See Florida v. Bostick, 501 U.S. 429, 434 (1991).

shows that Fregoso-Bonilla clearly understood Gibson's request. Therefore, I agree with the magistrate judge that Fregoso-Bonilla's verbal consent to search was voluntary. For all of these reasons, the motions to suppress physical evidence must be denied.[13]

## II. MOTIONS TO DISMISS

### A. Joint Motion to Dismiss Count One

Defendants moved to dismiss count one,[14] which charges them with conducting an unlicensed money transmitting business, contrary to 18 U.S.C. § 1960(a) and (b)(1)(A) & (B). Those provisions state, in pertinent part:

> (a) Whoever knowingly conducts, controls, manages, supervises, directs, or owns all or part of an unlicensed money transmitting business, shall be fined in accordance with this title or imprisoned not more than 5 years, or both.

> (b) As used in this section--
>  (1) the term "unlicensed money transmitting business" means a money transmitting business which affects interstate or foreign commerce in any manner or degree and–
>    (A) is operated without an appropriate money transmitting license in a State where such operation is punishable as a misdemeanor or a felony under State law, whether or not the defendant knew that the operation was required to be licensed or that the operation was so punishable; [or]

---

[13]As noted above, the magistrate judge recommended that defendants' motions to suppress their statements based on a Miranda violation be granted. The government does not object, so my review of that recommendation is for clear error only. Based on the evidence that defendants were in custody at the time of their statements, as discussed at pages 13-17 of the recommendation, I find no clear error and accordingly grant defendants' motions to suppress their statements based on a Miranda violation.

[14]Fregoso-Bonilla filed the motion to dismiss, which the magistrate judge allowed Valle-Fregoso to adopt and join. However, Valle-Fregoso has not filed an objection to the magistrate judge's recommendation that the motion be denied.

> (B) fails to comply with the money transmitting business registration requirements under section 5330 of title 31, United States Code, or regulations prescribed under such section[.]

Defendants argue that the statute fails to give proper notice of what is prohibited because it lacks a mens rea requirement in sub-section (b).  Specifically, while the statute requires that the person knowingly conduct the money transacting business in sub-section (a), it does not require that she know that a license is required as set forth in sub-section (b).  Defendants further argue that the statute fails to adequately define the term "money transmitting business," such that a reasonable person would understand the activities proscribed.

### 1.    Mens Rea Requirement

I agree with the magistrate judge that the government need not prove that defendants knew that a license was required to operate a money transmitting business.[15] Therefore, the indictment is sufficient, and the motion must be denied.

The definition of the elements of a criminal offense is entrusted to the legislature, particularly in the case of federal crimes, which are solely creatures of statute.  Staples v. United States, 511 U.S. 600, 604 (1994).  Thus, determining the mental state  required for commission of a federal crime requires construction of the statute and inference of the intent of Congress.  Id. at 605.

In the present case, § 1960(b)(1)(A) plainly states that operating an unlicensed money transmitting business is prohibited, "whether or not the defendant knew that the operation was required to be licensed."  Courts construing the statute have thus held that

---

[15]It appears that the government must prove that defendants knew that the business was not, in fact, licensed, but the parties do not address this issue.

16

the defendant need not be aware of the state licensing requirement.  See, e.g., United States v. Talebnejad, No. 04-4841 & 04-4873, 2006 U.S. App. LEXIS 21336, at *12 (4th Cir. Aug. 21, 2006); United States v. Uddin, 365 F. Supp. 2d 825, 829-30 (E.D. Mich. 2005) (citing United States v. Barre, 324 F. Supp. 2d 1173, 1177 (D. Colo. 2004)).  These courts rely not only on the plain language of the statute quoted above but also on the fact that, in the PATRIOT Act of 2001, Congress specifically changed the law – which formerly required specific knowledge of state licensing requirements – to make it a general intent crime.  Uddin, 365 F. Supp. 2d at 829 ("'The proposal makes clear that an offense under § 1960 is a general intent crime for which a defendant is liable if he knowingly operates an unlicensed money transmitting  business.  For purposes of a criminal prosecution, the government would not have to show that the defendant knew that a State license was required or that the Federal registration requirement promulgated pursuant to 31 U.S.C. § 5330 applied to the business.'") (quoting the House Report on the bill); see also id. at 827 ("'Section 373 of the USA PATRIOT Act amended federal law by eliminating this loophole requiring that the defendant know about state licensing requirements[.]'") (quoting the Department of Justice Report on the PATRIOT Act); see also United States v. Rahman, 417 F. Supp. 2d 725, 728 (E.D.N.C. 2006) ("The legislative history of section 1960 confirms that Congress' purpose in amending section 1960 in 2001 was to clarify that section 1960 is a general intent crime and does not require a defendant to know that an illegal money transmitting business was required to be licenced under state law.").

This interpretation of § 1960 is consistent with the interpretation courts have given a closely related statute – § 1955 – which proscribes illegal gambling businesses.  In order to violate § 1955, the defendant must conduct a gambling business that: (1) violated state

17

law; (2) involved five or more persons; and (3) was either in substantial continuous operation for more than 30 days, or had gross revenue of $ 2,000 or more in a single day. United States v. Cyprian, 23 F.3d 1189, 1199 n.14 (7th Cir. 1994). In Cyprian, the defendant argued that his conviction was infirm because the evidence did not show that he knew the games he conducted violated state law. The court rejected the argument, stating: "This state of mind theory is not supported by the express language of the statute or any case law and is not an essential element of the offense which the government must prove for a conviction. In fact, because guilt under § 1955 is premised upon 'conduct,' Williams did not need to know that his actions were illegal; he only needed to know that he performed the acts which turned out to be illegal." Id. at 1199; see also United States v. Ables, 167 F.3d 1021, 1031 (6th Cir. 1999) ("Because the crime of conducting an illegal gambling business as defined under § 1955 is one of general intent, Ables cannot evade conviction under that section by establishing that he unwittingly or unknowingly conducted the bingo games at Castle Bingo in violation of the law of Kentucky.").

In the present case, defendants are charged with violating § 1960(b)(1)(A) and (b)(1)(B). It is clear, based on the statutory language, legislative history and case-law discussed above, that Congress (now) intends § 1960(b)(1)(A) to be a general intent crime. Section 1960(b)(1)(B) apparently never contained a mens rea requirement, as § 1960(b)(1)(A) did before the PATRIOT Act. Nevertheless, given the design of the statute, which contains a mens rea requirement in § 1960(a) but not § 1960(b), coupled with Congress's failure to amend § 1960(b)(1)(B) in the PATRIOT Act, I find that there is no specific knowledge requirement under § 1960(b)(1)(B) either. See Talebnejad, 2006 U.S. App. LEXIS 21336, at *24-25 (finding that § 1960(b)(1)(B) sets forth a constitutionally valid

18

general intent crime, just as § 1960(b)(1)(A) does); United States v. Keleta, No. 05-371, 2006 U.S. Dist. LEXIS 55078, at *4 (D.D.C. June 28, 2006) (holding that § 1960(b)(1)(B) does not contain a knowledge or wilfulness requirement).

First, it is plain that Congress knows how to insert a specific knowledge requirement when it wants to; it did so in § 1960(b)(1)(A) prior to 2001, but not § 1960(b)(1)(B). Second, the fact that Congress did not feel it necessary to amend § 1960(b)(1)(B) in 2001 demonstrates that it did not believe that that provision implicitly contained a specific knowledge requirement.  In other words, because there was no "loophole" to close, no amendment of § 1960(b)(1)(B) was necessary.  See Uddin, 365 F. Supp. 2d at 829-30. Finally, the House report on this provision of the PATRIOT Act confirms that Congress believed that "'the government would not have to show that the defendant knew that a State license was required or that the Federal registration requirement promulgated pursuant to 31 U.S.C. § 5330 applied to the business.'"  Id. at 829 (quoting House Report) (emphasis added).  Therefore, I conclude that the government need not show that defendants knew their business was subject to the money transmitting business registration requirements under section 5330 of Title 31, United States Code, or the regulations prescribed thereunder.

In her objections, Fregoso-Bonilla relies on United States v. Talebnejad, 342 F. Supp. 2d 346 (D. Md. 2004).  However, that decision has been reversed by the Fourth Circuit.  Talebnejad, 2006 U.S. App. LEXIS 21336, at *26.  Moreover, the district court's decision in Talebnejad is both distinguishable on the facts and unpersuasive on the law. The district court held that because the state law applicable in that case required knowledge of money transmission licensing requirements to support a conviction, and §

19

1960(b)(1)(A) requires a violation of state licensing law, the government was required to prove a knowing violation of the state licensing requirement under § 1960(b)(1)(A). It is difficult to accept this conclusion, which renders surplusage the language added to § 1960(b)(1)(A) in 2001 (depending on the state). Congress plainly intended amended § 1960(b)(1)(A) to dispense with the specific knowledge requirement.

However, even if I were to accept the district court's incorporation of the state's mens rea requirement, Wisconsin law does not appear to require specific intent, as did the Maryland law applicable in Talebnejad. Fregoso-Bonilla makes the bald claim that "Wisconsin does have a mens rea element in Chapter 217." (Fregoso-Bonilla Objec. at 9.) However, she cites no statutory language in support of her position. The superseding indictment does not allege the specific provisions of Wisconsin law defendants allegedly violated. Assuming that the government relies Wis. Stat. ch. 217, it does not appear that the provisions of that chapter require a willful violation of the licensing requirements. See Wis. Stat. § 217.03(1) ("No person shall, as a service or for a fee or other consideration, engage in the business as a seller of checks without first securing a license from the division to do so."); Wis. Stat. § 217.16 ("Any person who directly or through another violates or attempts to violate this chapter may be fined not more than 500 or imprisoned not more than 6 months or both. Each transaction in violation of this chapter and each day that a violation continues is a separate offense."). Thus, even if I accepted the position of the district court in Talebnajad, which I do not, the argument would fail.[16]

---

[16]On appeal, the dissenting circuit judge agreed with the district court that the government must prove specific intent if the applicable state licensing law so requires. Talebnejad, 2006 U.S. App. LEXIS 21336, at *30 (Gregory, J., dissenting). As discussed in the text, even accepting this position, Wisconsin, unlike Maryland, does not require

Fregoso-Bonilla also relies on dicta in the district court's decision in <u>Talebnejad</u> stating that § 1960(b)(1)(B) requires specific intent, as well. Essentially, the court concluded that because Congress did not amend § 1960(b)(1)(B) in the PATRIOT Act, it intended that provision to include a specific intent requirement, as § 1960(b)(1)(A) used to. 342 F. Supp. 2d at 355-56. The Fourth Circuit rejected this argument on appeal, 2006 U.S. App. LEXIS 21336, at *23-25, and for the reasons previously stated, I reject it also. <u>See also</u> <u>Keleta</u>, 2006 U.S. Dist. LEXIS 55078, at *3 (finding the district court's decision in <u>Talebnejad</u> unpersuasive).

Thus, for all of these reasons and those stated by the magistrate judge, defendants' motions to dismiss count one based on the lack of a mens rea requirement are denied.

### 2. Vagueness

Defendants also argue that the statute is unconstitutionally vague because it fails to sufficiently define the phrase "unlicensed money transmitting business." A criminal statute must provide fair warning of what is prohibited in language that the common world will understand. <u>United States v. Lanier</u>, 520 U.S. 259, 265 (1997).

As the magistrate judge noted, the terms used in this statute are understandable by persons of ordinary intelligence. Simply put, the law prevents a person from operating a business that transmits or transfers funds without a license. Persons of common intelligence would not have to guess at the meaning of these terms. <u>United States v. Velastegui</u>, 199 F.3d 590, 595 (2d Cir. 1999) (stating that "section 1960 applies with sufficient clarity to comport with the constitutional fair notice requirement").

_____

knowledge that a license is required.

In her objections, Fregoso-Bonilla argues that she and her co-defendant are Spanish speaking, with no command of the English language, and lacked any reasonable expectation that their conduct was criminal. However, the vagueness standard is objective. See United States v. Kozminski, 487 U.S. 931, 949-50 (1988). It is thus irrelevant that these particular defendants were unsophisticated or unfamiliar with American law. See also Cheek v. United States, 498 U.S. 192, 199 (1991) ("The general rule that ignorance of the law or a mistake of law is no defense to criminal prosecution is deeply rooted in the American legal system.").

Fregoso-Bonilla also alleges that this prosecution is a politically driven response to 9/11 and amounts to an arbitrary and discriminatory enforcement of the law. However, the government has broad discretion in determining whom to prosecute and what charges to bring. United States v. Sandoval-Curiel, 50 F.3d 1389, 1394 (7th Cir. 1995). Thus, so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion. United States v. Armstrong, 517 U.S. 456, 464 (1996). Fregoso-Bonilla makes no effort to establish a prima facie case of selective prosecution under the rigorous standards set forth in Armstrong and United States v. Alanis, 265 F.3d 576, 585 (7th Cir. 2001). Thus, her argument fails.

Therefore, for all of these reasons and those stated by the magistrate judge, defendants' motions to dismiss on this basis are denied.

**B.      Fregoso-Bonilla's Challenge to Sufficiency of Count One**

Defendant Fregoso-Bonilla also moved to dismiss count one on the grounds that the indictment is insufficient as to her.  She based her argument on the criminal complaint that preceded the indictment, which, she claimed, contains insufficient facts to prove that she committed the crime alleged.  She surmises that the government relied on the same facts before the grand jury.

A defendant cannot via a motion to dismiss the indictment challenge either the evidence the government will present at trial, see, e.g., United States v. Todd, 446 F.3d 1062, 1067 (10th Cir. 2006) ("Challenging an indictment is not a means of testing the strength or weakness of the government's case, or the sufficiency of the government's evidence."), or the probable cause determination made by the grand jury, see, e.g., United States v. Calandra, 414 U.S. 338, 345 (1974) (stating that "an indictment valid on its face is not subject to challenge on the ground that the grand jury acted on inadequate or incompetent evidence").  An indictment is sufficient if it states all of the elements of the offense, informs the defendant of the nature of the charges, and is sufficiently specific to enable the defendant to assess double jeopardy issues.  See United States v. Spears, 965 F.2d 262, 279 (7th Cir. 1992).  The present indictment accomplishes all of these things. As the magistrate judge noted, the criminal complaint is not a pleading in a felony case, and it is inappropriate for the court to consider its contents in ruling on a challenge to the indictment.  See Fed. R. Crim. P. 12(a).  Therefore, the motion fails.

In her objections, Fregoso-Bonilla states that it is appropriate for the court to dismiss an indictment based on insufficient evidence when the operative facts are undisputed and the government does not object.  See United States v. Hall, 20 F.3d 1084, 1087 (10th Cir.

23

1994) ("Notwithstanding these general principles, this circuit has upheld a pretrial dismissal under Rule 12(b) based on the insufficiency of the evidence where the underlying facts were essentially undisputed and the government failed to object to the district court's resort to evidence beyond the four corners of the indictment."). She contends that the essential facts upon which the government bases its case are set forth in the affidavit in support of the criminal complaint, and that the government has not objected to the court making a determination as to their sufficiency. However, in its response, the government states that it does not agree to a pre-trial test of the sufficiency of the evidence. Rather, it supports the magistrate judge's focus on the language of the superseding indictment. Under these circumstances, it would be improper for me to weigh the evidence. I therefore adhere to the general rule that challenges to the evidence are properly raised at trial, not by pre-trial motion. See Hall, 20 F.3d at 1088 ("We note, however, that such a scenario is not likely to recur and we caution both the trial courts and counsel that the procedure here employed is indeed the rare exception.").[17]

Lastly, Fregoso-Bonilla argues, citing United States v. Zemater, 501 F.2d 540 (7th Cir. 1974), that the indictment fails to allege a violation of state law. Zemater involved a challenge to a Travel Act conviction. Under that statute, the government must prove that the defendant used a facility in interstate commerce to facilitate the carrying on of an illegal enterprise as defined by the statute and thereafter performed the carrying on of the

---

[17]In her motion, Fregoso-Bonilla argued that Wisconsin requires a license for "sellers of checks," while she is accused of dealing with cash. At this point, I do not know what the evidence will show. If, in fact, the government's evidence fails to show that defendants conducted the sort of business Wisconsin requires be licensed, the prosecution under § 1960(b)(1)(A) may fail. But that is an issue for trial.

24

unlawful activity.  Included as "unlawful activity" are prostitution offenses in violation of the laws of the State in which they are committed.  Id. at 544.  The problem in Zemater was that while the indictment alleged a violation of Illinois pandering law, the prostitution in that case occurred in Saigon.  The court therefore vacated the conviction.  Zemater has no applicability to the present case.  The instant indictment tracks the language of § 1960(b)(1)(A) by alleging that defendants operated a money transmitting business that was not licensed by the state of Wisconsin, where such operation is punishable as a misdemeanor or felony.  It need allege no more.

### III.  CONCLUSION

THEREFORE, IT IS ORDERED that defendants' motions to suppress physical evidence (R. 28, 30-5) are DENIED.

IT IS FURTHER ORDERED that defendants' motions to suppress their statements (R. 26, 30-5) are GRANTED.

IT IS FURTHER ORDERED that the magistrate judge's recommendation on defendants' motion to dismiss (R. 59) is ADOPTED, and defendants' motions to dismiss (R. 30-1, 30-3, 47) are DENIED.

FINALLY, IT IS ORDERED that this matter is scheduled for TELEPHONIC STATUS on **Monday, September 11, 2006, at 1:00 p.m.**  The court will address further scheduling at the time.  The court will initiate the call.

Dated at Milwaukee, Wisconsin, this 7th day of September, 2006.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge

25